United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ERHAN KAYIK,

           Plaintiff,

    v.

RALPH M. DIAZ,

           Defendant.

Case No. 12-cv-05907-TEH

**ORDER DENYING MOTION FOR EVIDENTIARY HEARING; DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Erhan Kayik, a California state prisoner sentenced to 15 years to life, seeks a writ of habeas corpus under 28 U.S.C. Section 2254 and an evidentiary hearing under Habeas Corpus Local Rule 2254-7 and Rule 8(a) of the Rules Governing Section 2254 Cases. For the reasons stated below, the motion for an evidentiary hearing is DENIED; and the petition for writ of habeas corpus is DENIED.

**BACKGROUND**

**I.    Volkan's Death**

The following facts, taken from the California Court of Appeal's unpublished decision, have not been rebutted with clear and convincing evidence and must, therefore, be presumed correct. 28 U.S.C. § 2254(e)(1).

> [Petitioner] was convicted of murdering his 16-year-old son Volkan.
>
> [Petitioner] was born and raised in Turkey. He married in 1990 and shortly thereafter his wife gave birth to Volkan. [Petitioner] and his wife divorced when Volkan was one. Sometime thereafter, Volkan's mother died in an accident. [Petitioner] blamed Volkan for her death. [Petitioner] remarried and moved to the United States. Volkan remained in Turkey with his grandparents.
>
> Volkan was a charming child but he was also difficult in some ways. He did poorly in school and had problems at work.

United States District Court
Northern District of California

Volkan also ran away from home. The problems grew serious enough that [Petitioner] went to Turkey and brought Volkan back to the United States.

Volkan's problems continued after the move. He got into fights at school and ran away from home repeatedly. [Petitioner], who was struggling to overcome the effects of a recent heart attack, found Volkan's problems to be challenging.

On at least one occasion, [Petitioner]'s response to Volkan's behavioral problems exceeded permissible bounds. Volkan told a social worker, Randall Freitas, that [Petitioner] hit him. Thereafter in May 2007, Freitas met with [Petitioner] and Volkan at their home. [Petitioner] admitted he hit Volkan in the face. Freitas said that was not an acceptable method of discipline in this country and that if [Petitioner] left any marks, he would be charged with child abuse. Freitas made [Petitioner] and his wife sign a safety plan and told them to attend counseling.

On June 20, 2007, [Petitioner] phoned police to report that Volkan had run away about a week earlier. [Petitioner] said he did not call immediately because Volkan ran away frequently.

Omer Tutmaz was [Petitioner]'s friend. In July 2007, Tutmaz visited [Petitioner] and offered to help him look for Volkan. [Petitioner] and Tutmaz went to a lake that Volkan visited sometimes. [Petitioner] described an earlier incident during which Volkan had pulled down his swim trunks and displayed his bottom to an older man. [Petitioner] was concerned because such conduct is unacceptable in the Turkish culture.

In August 2007, [Petitioner] and Tutmaz met while on a business trip. [Petitioner] was upset because he believed friends had betrayed him. He bemoaned the fact that others were not as trustworthy as Tutmaz, and in an effort to prove his fidelity [Petitioner] said, "do you know how much I trust you?" "I killed Volkan. This much I trust you." Tutmaz was shocked by the admission. He did not know what to do. [Petitioner] and Tutmaz both went to their rooms.

[Petitioner] and Tutmaz spoke again the following day. [Petitioner] said he killed Volkan the day he displayed his bottom to the man at the lake. According to [Petitioner], he confronted Volkan about why he was constantly running away. When Volkan refused to answer, [Petitioner] put his hands around Volkan's neck and choked him until "[q]uite a bit of blood" came out of his mouth. Volkan relented and agreed to tell [Petitioner] "everything." [Petitioner] replied, "You had the chance to tell me so long, now there's blood coming out of your mouth. It's too late. I'm going to kill you."

Tutmaz asked [Petitioner] why he continued to choke Volkan. [Petitioner] replied it was "already too late." If he had let Volkan go, he would have to go to jail anyway. Therefore [Petitioner] chose "to finish it." He squeezed Volkan's neck

2

United States District Court
Northern District of California

1

while Volkan pleaded for mercy. Volkan was unable to struggle because he was so small.

2

[Petitioner] told Tutmaz that once Volkan was dead, he took his body and buried it in the hills. He blamed Volkan's death on business associates who had betrayed him.

3

4

Tutmaz did not go to the police immediately and tell them what [Petitioner] had done. He wanted to give [Petitioner] a few days to turn himself in. When [Petitioner] did not do so, Tutmaz went to the police on August 16, 2007, and told them [Petitioner] killed Volkan.

5

6

7

A detective interviewed [Petitioner] and his wife on September 7, 2007. [Petitioner] said Volkan was missing and suggested that the detective contact a homeless man with whom Volkan associated.

8

9

10

The detective interviewed [Petitioner] about a month later on October 2, 2007, and again, [Petitioner] said Volkan was simply missing. [Petitioner] said any comments Tutmaz may have made to the contrary were caused by business problems he had with Tutmaz's family.

11

12

13

The detective spoke with [Petitioner] again the following day and this time, [Petitioner] agreed to take him to Volkan's body. [Petitioner] and two officers drove about 190 miles to the mountains near Sierraville. [Petitioner] then led them to Volkan's burial site. Animals had dug up the body.

14

15

16

*People v. Kayik*, No. A-12-6088, 2011 WL 2237606, at *1-2 (Cal. Ct. App. June 8, 2011).

17

18

## II.   Petitioner's Trial

19

Based on the above facts, an information was filed on May 16, 2008 in Contra

20

Costa County Superior Court charging Petitioner with murder and inflicting corporal

21

injury on a child.  1 CT 158.  At trial, the prosecution presented the evidence set forth

22

above relating to Volkan's death.  Petitioner testified in his own defense, and his testimony

23

set forth facts that were slightly different from the facts above.  The California Court of

24

Appeal's unpublished decision sets forth Petitioner's testimony as follows:

25

26

[Petitioner] testified in his own defense and he admitted that he killed Volkan. [Petitioner] said the death occurred the day he saw Volkan display his bottom to the man at the lake. [Petitioner] brought Volkan home and they began to argue. At one point, [Petitioner]'s wife went to get some pizza. While she was gone, [Petitioner] and Volkan continued to argue.

27

28

3

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Volkan questioned why [Petitioner] had not been there for much of his life. [Petitioner] slapped Volkan in the face. Volkan went to his room. [Petitioner] followed and when Volkan refused to answer his questions, [Petitioner] "squeezed his neck." Volkan agreed to talk. [Petitioner] needed to "calm down" and he went to the living room. Volkan came out a few minutes later and sat next to him. [Petitioner] again asked Volkan what was happening. Volkan replied, "fuck you all. Have you done any fatherhood for me the last 16 years?" [Petitioner] was out of control. He "squeezed [Volkan's] neck and squeezed his neck and squeezed his neck...." Volkan kicked and struggled and tried to run away, but [Petitioner] would not stop. He continued squeezing until Volkan said "father" and then collapsed.

[Petitioner] tried to "wake [Volkan] up." That did not work, so he carried Volkan to the bathroom and put him in the bathtub. When [Petitioner]'s wife came home, he told her "Volkan is gone."

[Petitioner] called his mother in Turkey and told her what he had done. She told him to bury the body in a proper place. [Petitioner] wrapped Volkan's body and put it in the trunk of his car. He then drove until he found a spot to bury it. He did not dig a deep hole.

[Petitioner] also presented testimony from a doctor who said [Petitioner]'s heart attack had injured his brain. The doctor said [Petitioner] suffered from memory loss and had a low tolerance for frustration. A clinical neuropsychologist testified similarly. She said [Petitioner] suffered severe brain injury from this heart attack and that such injuries can cause personality alterations and behavioral problems.

In addition, [Petitioner] presented a wide array of evidence in an effort to show that Volkan had behavioral problems that had grown worse as he had gotten older. [Petitioner]'s mother testified that Volkan was aggressive and destructive as he was growing up. A clinical psychologist testified that Volkan had an oppositional defiant disorder. Children with that disorder are difficult to parent because they have trouble controlling their behavior. A psychiatrist who treated Volkan agreed he had oppositional defiant disorder. A relative from Turkey testified Volkan was disrespectful and frequently ran away from home. He also said Volkan had tried to attack his wife with a knife. One of [Petitioner]'s business associates said Volkan stole things. Volkan's cousin testified that Volkan smoked, ran away from school, and was disrespectful to his elders.

26

*Kayik*, 2011 WL 2237606, at *2-3.

27

///

28

///

4

Before jury deliberations began, Petitioner's trial counsel was advised that one of the jurors – Juror No. 5 – had been a suspect in a series of child abduction cases in the 1980s and 1990s.[1]  *Id.* at *5; 7 RT 1585.  The prosecutor and defense counsel discussed this new information with the trial court, and the court found that absent a stipulation from counsel, the court did not have good cause to excuse Juror No. 5.  7 RT 1585.  Defense counsel did not otherwise seek to remove Juror No. 5.  On February 20, 2009, the jury found Petitioner guilty of second degree murder.  2 CT 408; 4 CT 1027.

### III.    Post-Verdict Procedural Background

On May 8, 2009, Petitioner filed a motion for new trial based on juror misconduct. The trial court conducted a hearing on Petitioner's motion and denied it.  *Kayik*, 2011 WL 2237606, at *3.  On August 21, 2009, the trial court imposed judgment of imprisonment for 15 years to life.  5 CT 1361-63.

Petitioner appealed his conviction to the California Court of Appeal, which affirmed the conviction on June 8, 2011.  Ct. App. Order at 20, Ex. 2 to Answer.[2]  On June 21, 2011, Petitioner filed a petition for review in the California Supreme Court, which was denied on September 14, 2011.  Ex. 7 to Answer.  Petitioner filed a mixed petition for writ of habeas corpus on November 19, 2012, approximately three weeks before the end of the one-year statute of limitations period.  Docket No. 1.  On June 23, 2013, this Court granted Petitioner's motion for a stay and abeyance pending exhaustion of Petitioner's state court remedies.  Docket No. 10.  On July 23, 2014, the Superior Court denied Petitioner's state court habeas petition.  Ex. 11 to Answer.  On December 17, 2014, the California Supreme Court denied Petitioner's petition for review from the denial of his state habeas petition, thus exhausting Petitioner's state remedies.  Ex. 9 to Answer.

---

[1]     One of Petitioner's claims involves Juror No. 5's answers to questions on the voir dire questionnaires provided to prospective jurors.  Another claim is the Juror No. 5 and Juror No. 10 improperly introduced extrinsic evidence into jury deliberations.  These claims, and the related factual background, are discussed in more detail below.

[2]     Unless otherwise noted, all Exhibits cited are the Exhibits lodged with the Court by Respondent.  *See* Docket No. 21-3.

United States District Court
Northern District of California

Now before the Court is Petitioner's amended petition for writ of habeas corpus, filed on February 25, 2015.  Am. Pet. (Docket No. 16).  Also before the Court is Petitioner's motion for an evidentiary hearing, filed on November 30, 2015.  Mot. for Evid. Hearing (Docket No. 27).

**LEGAL STANDARD**

**I.      Habeas Petition**

Habeas petitions are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  28 U.S.C. § 2244, *et seq.*  Under AEDPA, a petitioner is entitled to federal habeas relief only if s/he can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(1)-(2); *Greene v. Fisher*, --- U.S. --- , 132 S. Ct. 38, 44 (2011).

AEDPA creates a "highly deferential" standard for evaluating state court rulings and "demands that state court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).  A state court's decision is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or arrives at a different result in a case that "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  "The state court's application of clearly established law must be objectively unreasonable, not just incorrect or erroneous." *Crittendon v. Ayers*, 624 F.3d 943, 950 (9th Cir. 2010) (internal quotation marks omitted). Further, a federal court must "presume the state court's factual findings to be correct, a presumption the petitioner has the burden of rebutting by clear and convincing evidence." *Id.*

United States District Court
Northern District of California

6

This standard is intentionally "difficult to meet," because habeas is intended to function as a "guard against extreme malfunctions in the state criminal justice systems, not as a means of error correction." *Greene*, 132 S. Ct. at 43 (citations omitted). A petitioner must therefore show that the "state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

## II.    Evidentiary Hearing

Rule 8(a) of the Rules Governing Section 2254 Cases provides that where a petition is not dismissed at a previous stage in the proceeding, the judge, after the answer and transcripts and record of the state court proceedings are filed, shall, upon review of those proceedings, determine whether an evidentiary hearing is required. The purpose of an evidentiary hearing is to resolve the merits of a factual dispute. An evidentiary hearing on a claim is required where it is clear from the petition that: (1) the allegations, if established, would entitle the petitioner to relief; and (2) the state court trier of fact has not reliably found the relevant facts. *See Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992).

## DISCUSSION

## I.    Habeas Petition

Petitioner presents five claims for habeas relief in his petition to this Court. Specifically, Petitioner contends: (1) his due process rights were violated when the trial court failed to instruct the jury on involuntary manslaughter; (2) his right to an impartial jury was violated when the trial court denied his motion for a new trial based on jury misconduct; (3) his due process rights were violated when the trial court admitted evidence of his prior bad acts and the victim's hearsay statements; (4) he received ineffective assistance of counsel when his trial counsel failed to investigate a juror's background; and (5) he received ineffective assistance of counsel when his trial counsel failed to investigate

and develop evidence concerning the victim's possible birth defect.  In evaluating these claims, the Court reviews the last reasoned state court decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991).

### A.      Claim 1: Failure to Instruct the Jury on Involuntary Manslaughter

The trial court instructed the jury on first degree murder, second degree murder, and voluntary manslaughter under a heat-of-passion theory, but did not instruct the jury on involuntary manslaughter.  7 RT 1563-73.  Defense counsel did not object to the lack of instruction on involuntary manslaughter.  Petitioner contends that the trial court's failure to instruct the jury on involuntary manslaughter constituted a violation of Petitioner's due process rights.  This claim was considered and denied on the merits by the California Court of Appeal, which is the last reasoned state court decision.  *See* Ex. 8.

The Court of Appeal correctly stated that "[a] trial court is obligated to instruct, sua sponte, on all legal theories that find substantial support in the evidence, but not on theories that are unsupported."  *Kayik*, 2011 WL 2237606, at *3 (citing *People v. Breverman*, 19 Cal. 4th 142, 162 (1998)).  The Court of Appeal noted that during the trial, Petitioner admitted "that while arguing with Volkan, he lost control.  He grabbed Volkan and 'squeezed his neck and squeezed his neck and squeezed his neck…' Volkan kicked and struggled and tried to run away, but [Petitioner] would not stop.  He continued to squeeze until Volkan collapsed."  *Id.* at *4.  Therefore, the Court of Appeal found that there was no support in the evidence for an instruction on involuntary manslaughter because no reasonable juror could find involuntary manslaughter from the testimony presented at trial.  *Id.*

A petitioner is not entitled to federal habeas corpus relief based on an erroneous jury instruction unless "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987).  The Ninth Circuit has stated that "an omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law, and, thus, a habeas petitioner

whose claim involves a failure to give a particular instruction bears an especially heavy burden." *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997).

The Court of Appeal's finding that the evidence did not support an involuntary manslaughter instruction was not contrary to clearly established law; therefore, the omission of the instruction does not amount to a constitutional violation. The Supreme Court has declined to hold that a defendant in a non-capital case is constitutionally entitled to instructions on a lesser-included offense. *Keeble v. United States*, 412 U.S. 205, 213 (1973), *cf. Beck v. Alabama*, 447 U.S. 625, 645 (1980). Therefore, there is no "clearly established federal law" that would have required the trial court to give the instruction *sua sponte*; the only "clearly established federal law" pertaining to Petitioner's first claim establishes that due process does not require that an instruction be given unless the evidence supports it. *Hopper v. Evans*, 456 U.S. 605, 611 (1982).

Finally, even if the trial court did err in omitting the involuntary manslaughter instruction, Petitioner is not entitled to federal habeas relief because no prejudice resulted from the omission. Petitioner, in addition to showing error, must show that "the error had a substantial and injurious effect or influence in determining the jury's verdict." *California v. Roy*, 519 U.S. 2, 5 (1996) (internal quotations omitted). Here, the jury convicted Petitioner of second degree murder, and thus necessarily found that he acted with the requisite intent: conscious disregard for human life. Therefore, an instruction on involuntary manslaughter, which encompasses a lower level of intent, would not have changed the outcome of the jury's deliberations.

Because the Court of Appeal's decision was entirely supported by the factual record and involved a reasonable application of Supreme Court authority, Petitioner's first claim is without merit and is therefore DENIED.

### B.      Claim 2: Failure to Grant New Trial Based on Juror Misconduct

Petitioner's next claim is based on purported juror misconduct. Petitioner contends that the trial court's denial of a new trial based on juror misconduct violated Petitioner's

Sixth Amendment right to trial by an impartial jury.  Petitioner identifies two types of purported misconduct: (1) that Juror No. 5 was biased and improperly concealed his bias during voir dire; and (2) that Jurors Nos. 5 and 10 improperly introduced extrinsic evidence into the jury deliberation process.  Petitioner's claim regarding juror misconduct was considered on the merits by the California Court of Appeal, which is the last reasoned decision.  *See* Ex. 8.

### 1.   *Procedural default*

At the outset, the state trial court previously found that Petitioner's trial counsel had forfeited any claim relating to Juror No. 5's background because trial counsel was put on notice of Juror No. 5's background but chose not to challenge him.[3]  The California Court of Appeal noted that there was "considerable support for the trial court's ruling on this point."  *Kayik*, 2011 WL 2237606, at *6.  A state court finding that a claim is procedurally defaulted is an adequate and independent state ground warranting denial of the claim in federal habeas.  *Ylst*, 501 U.S. at 801.  Thus, the claim very well may be barred.  However, the juror misconduct claims lack substantive merit as well; therefore, mirroring the California Court of Appeal, this Court will address the merits of the claims.

### 2.   *Bias*

Petitioner contends that Juror No. 5 was biased, and that his bias violated Petitioner's right to due process of law and right to an impartial jury under the Fifth, Sixth and Fourteenth Amendments.  Juror No. 5's purported bias stems from his failure to disclose information about his connection to the past child abduction cases, including past involvement with psychologists and experience with law enforcement.  Juror No. 5 also failed to fully disclose that he had been terminated for job misconduct.

---

[3]   The Court may consider both the trial court and appellate court decisions on this issue because the appellate court decision "adopts or substantially incorporates the reasoning" of the trial court.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007).

United States District Court
Northern District of California

United States District Court
Northern District of California

1       The California Court of Appeal independently considered the potential bias of Juror

2   No. 5, considering at length all of the questions Juror No. 5 purportedly answered

3   incorrectly on the questionnaire.  The Court of Appeal also considered the state trial

4   court's finding of two instances where Juror No. 5 intentionally provided misleading

5   answers; therefore, the Court of Appeal found that the misconduct created a presumption

6   of prejudice.  *Kayik*, 2011 WL 2237606, at *9.

7       The two misleading answers identified by the state trial court were in response to

8   question numbers 17 and 74.  Question number 17 asked, "Have you ever been fired, laid

9   off or asked to resign from a job?"  *Id.* at *7.  Juror No. 5 answered in the affirmative, but

10  his explanation (that he had been "[l]aid off several jobs due to lack of work") was

11  admittedly incomplete because Juror No. 5 did not include the fact that he had been fired

12  "on two separate occasions for violating workplace rules."  *Id.*  Question number 74 asked,

13  "Have you ever had any experiences with law enforcement, a prosecutor, a criminal

14  defense attorney, a judge, or the court system generally which you would characterize as

15  unfair or unpleasant?"  *Id.* at *8.  Juror No. 5 answered in the negative.  *Id.*  However, an

16  investigator who spoke to Juror No. 5 after the trial stated that Juror No. 5 admitted to the

17  investigator that the answer was "a mistake," because he had been the subjective of

18  extensive investigations that he found "harassing, unfair and unpleasant."  *Id.*  Juror No. 5

19  contended that the mistake was not intentional, but instead was a result of fatigue and

20  reading the question too hastily in an effort to fill out his questionnaire quickly.  *Id.*

21      A criminal defendant has a constitutional right to a trial by impartial jurors.  U.S.

22  Const. amends. VI, XIV.  The voir dire process serves to safeguard this right by allowing

23  the removal of prospective jurors who will not be able to impartially follow the court's

24  instructions.  "A juror who conceals relevant facts or gives false answers during the voir

25  dire examination thus undermines the jury selection process and commits misconduct."  *In*

26  *re Hitchings*, 6 Cal. 4th 97, 111 (1993).

27      Juror misconduct "raises a presumption of prejudice that may be rebutted by proof

28  that no prejudice actually resulted.  *People v. Cooper*, 53 Cal. 3d 771, 835 (1991).

United States District Court
Northern District of California

However, the Court of Appeal found that there was no actual bias or prejudice as a result of Juror No. 5's alleged misconduct.  Adopting the trial court's reasoning, the Court of Appeal found that it was not substantially likely that Juror No. 5 was biased against Petitioner.  *Kayik*, 2011 WL 2237606, at *10.  In fact, the Court of Appeal found that if Juror No. 5 was biased at all, such bias was likely in favor of Petitioner, because a juror with Juror No. 5's experiences would likely be susceptible to an argument that Petitioner was falsely accused or otherwise mistreated by the justice system.  *Id*.  Finally, the Court of Appeal agreed with the trial court that "the best indication [that there was no bias against Petitioner] is the fact that defense counsel, once the information was known in substance, declined to request or stipulate that Juror Number 5 be removed."  *Id.*

The Court of Appeal's finding that there was no prejudice was independent factual determination, and thus must be presumed correct by this Court.  28 U.S.C. § 2254(e)(1). For these reasons, the Court finds that the Court of Appeal's determination that Juror No. 5 was not biased was not an unreasonable application of clearly established law, and is fully supported by the record.  Therefore, Petitioner is not entitled to habeas relief on this claim.

### 3.      *Extrinsic evidence*

Petitioner also contends that Jurors Nos. 5 and 10 improperly introduced extrinsic evidence into the jury deliberation process.  During deliberations, Juror No. 5 described an experience where he was nearly choked to death, and said that the experience informed Juror No. 5's opinion of Petitioner's mental state, because he was convinced that it would take several minutes to kill a person by strangulation.  *Kayik*, 2011 WL 2237606, at *10. Also during deliberations, Juror No. 10 relayed her experience of having a brain tumor surgically removed, and shared with the other jurors that she did not suffer any brain impairment or memory loss as a result of the surgery.  *Id.*

"The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence produced at trial."  *Estrada v. Scribner*, 512 F.3d 1227, 1238 (9th Cir. 2008).  The Confrontation Clause is implicated by a juror's communication of

United States District Court
Northern District of California

1    extraneous facts to other jurors, because "[t]he juror in effect becomes an unsworn witness,

2    not subject to confrontation or cross examination."  *Id*. (internal quotation marks and

3    citation omitted).  Furthermore, a petitioner is entitled to habeas relief only if it can be

4    established that exposure to extrinsic evidence had "substantial and injurious effect or

5    influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637

6    (1993); *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995).

7         The Court of Appeal considered this claim as well as evidence submitted by

8    Petitioner, and found that the conduct of Jurors Nos. 5 and 10 did not amount to

9    misconduct because they were simply "rely[ing] on their own personal experience to help

10   them evaluate the evidence that had been presented," which, as a normal part of jury

11   deliberations, was not improper.  *Kayik*, 2011 WL 2237606, at *11.  The Court of Appeal

12   also found that even if the conduct had been improper, no prejudice actually resulted

13   because (1) the statement of Juror No. 5 about strangulation was consistent with the trial

14   testimony and thus did not exercise improper influence over the jurors; and (2) the

15   statement of Juror No. 10 about her brain surgery was unrelated to Petitioner's experience

16   with a heart attack, and thus would be unlikely to have much effect on the jurors.  *Id.*

17        "It is expected that jurors will bring their life experiences to bear on the facts of a

18   case."  *Hard v. Burlington N. R. R. Co.,* 870 F.2d 1454, 1462 (9th Cir. 1989) (affirming

19   denial of new trial despite allegations that a juror with special knowledge regarding x-ray

20   interpretation attempted to use that knowledge to sway other jurors).  The Court of

21   Appeal's decision that the actions of Jurors Nos. 5 and 10 were not misconduct, but rather

22   permissible introduction of life experiences, is supported by the factual record and is

23   objectively reasonable.  However, even if the two jurors committed misconduct,

24   Petitioner's claim would also fail on the merits due to lack of prejudice.

25        The inference the jurors may have drawn from Juror No. 5's account of his own

26   near-strangulation is that it likely would have taken Petitioner several minutes to kill

27   Volkan by strangulation, and therefore that Volkan's death could not have happened

28   instantaneously.  Because Petitioner admitted that he "squeezed and squeezed and

13

squeezed" Volkan's neck (4 RT 932), and there had already been expert testimony that was consistent with Juror No. 5's narrative, the jurors' exposure to the alleged extrinsic evidence could not have prejudiced their deliberations.  Furthermore, because Juror No. 10's experience (surgery to remove a brain tumor) was so divergent from Petitioner's situation (a heart attack), it is unlikely that Juror No. 10's narrative could have prejudiced the jury either.

Therefore, the Court finds that the purported extrinsic evidence was not prejudicial because it did not have a substantial and injurious effect or influence in determining the jury's verdict.  For these reasons, and because the Court of Appeal decision was supported by the record and involved a reasonable application of federal law, the Court DENIES Petitioner's request for habeas relief as to his juror misconduct claim.

### C.      Claim 3: Trial Court's Admission of Evidence

Petitioner seeks habeas relief from the trial court's admission of the following evidence: (1) a social worker's testimony that Petitioner had admitted that he had hit Volkan in the face; (2) a teacher's testimony that Petitioner blamed Volkan for Volkan's mother's death; (3) testimony from Volkan's friends that Volkan was afraid of Petitioner and that Petitioner had hit and threatened Volkan; and (4) a stipulation that a friend of Volkan's would testify that he saw Petitioner chasing Volkan and yelling at him in Turkish.  *Kayik*, 2011 WL 2237606, at *11-12.

A federal habeas court "cannot review questions of state evidence law" and may only consider "whether the petitioner's conviction violated constitutional norms."  *Henry v. Kernan,* 197 F.3d 1021, 1031 (9th Cir. 1999).  Even if "it appears that evidence was erroneously admitted, a federal court will interfere only if it appears that its admission violated fundamental due process and the right to a fair trial."  *Id.* (citing *Hill v. United States,* 368 U.S. 424, 428 (1962)).  The Ninth Circuit advises that "[o]nly if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process" and "[e]ven then, the evidence must be of such quality as necessarily prevents a

United States District Court
Northern District of California

14

1    fair trial." *Jammal v. Van de Kamp,* 926 F.2d 918, 919 (9th Cir.1991) (emphasis in

2    original) (internal quotations omitted).

3          Here, there were permissible inferences that the jury could draw from the testimony

4    of the social worker and the teacher.  Under California Evidence Code Section 1101, other

5    than evidence used to prove a person's disposition to commit a crime, evidence "relevant

6    to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge…)"

7    is freely admissible.  *Hurd v. Carey*, 280 F. Supp. 2d 980, 986 (N.D. Cal. 2003).  The

8    social worker's testimony that Petitioner had hit Volkan before and was told of the

9    consequences of hitting him again could support an inference relating to Petitioner's

10   motive for killing Volkan, as the Court of Appeal explained.  *Kayik*, 2011 WL 2237606, at

11   *12 ("Indeed, when Tutmaz asked [Petitioner] why he did not stop strangling Volkan

12   [Petitioner] replied that it was 'already too late' and that if he had let Volkan go, he would

13   have to go to jail anyway.").  The teacher's testimony relating to Petitioner blaming

14   Volkan for Volkan's mother's death could also support an inference that Petitioner had a

15   motive to kill Volkan, out of anger.  Finally, the evidence that Volkan was afraid of

16   Petitioner and that Petitioner had been seen chasing and yelling at Volkan supports an

17   inference that Petitioner may not have been entirely provoked by Volkan's bad behavior.[4]

18   Finally, the statements made by Volkan to his teacher and friends were not hearsay

19   statements because they were not used for the truth of the matter asserted, but rather to

20   show Volkan's state of mind in that he was afraid of Petitioner.

21         Under the broad federal habeas standard, the possibility that the jury could make

22   these permissible inferences is sufficient, on its own, to defeat Petitioner's claim.

23   However, in addition to proving constitutional error, Petitioner must also show that the

24   error had a "substantial and injurious" effect on the jury's verdict.  *Brecht*, 507 U.S. at 623.

25   The Court of Appeal correctly concluded that even if the admission of the evidence was

26

27   [4]      As the Court of Appeal noted, the evidence of Volkan's fear of his father was
28   correctly only admitted by the trial court as rebuttal evidence to the defense's theory of
     provocation.  *Kayik*, 2011 WL 2237606, at *11.

United States District Court
Northern District of California

erroneous, it was nevertheless harmless. *Kayik*, 2011 WL 2237606, at *14. The evidence that was admitted was quantitatively and qualitatively trivial when considered in the context of the entire trial. *Id.* at *14 ("The rebuttal evidence in question was brief and covered less than 20 pages of a more than 1,700-page transcript. The conduct identified was far less serious than the conduct [Petitioner] admitted to in open court and was not particularly harmful."). It certainly was not objectively unreasonable for the Court of Appeal to determine that the admission of the evidence was harmless. *See* 28 U.S.C. § 2254(d). For these reasons, Petitioner's claim relating to the trial court's admission of evidence is hereby DENIED on the merits.

### D.    Claims 4 and 5: Ineffective Assistance of Counsel

Petitioner brings two claims of ineffective assistance of counsel, both with regard to Petitioner's trial counsel. First, Petitioner contends that his trial counsel was ineffective when she failed to investigate Juror No. 5's background. Second, Petitioner contends that his trial counsel was ineffective because she failed to investigate the possibility of Volkan having a birth defect that could have made it more probable that Volkan suffered an instant death by neck compression.

To succeed on a claim of ineffective assistance of counsel, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). In the context of federal habeas relief, the district court does not review the trial counsel's performance directly; rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. This Court must therefore use "a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, --- U.S. --- , 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170,

190 (2011)).  The last reasoned state decision on both claims of ineffective assistance of counsel is the Superior Court's ruling on Petitioner's state habeas petition.  *See* Ex. 11.[5]

### 1.  *Failure to investigate Juror No. 5's background*

Petitioner's first challenge is to trial counsel's failure to investigate Juror No. 5's background during voir dire.  Petitioner alleges that trial counsel could have easily learned of Juror No. 5's connection with past notorious child abduction cases if she had conducted a Google search of Juror No. 5's name, or "his name plus the word 'crime' or 'criminal,'" and that "[s]uch a search would have resulted in a picture that could be compared to the actual juror."  Am. Pet. at m-19 (Docket No. 16).

The Superior Court rejected Petitioner's claim that his trial counsel rendered ineffective assistance by failing to investigate Juror No. 5's background.  Ex. 11 at 5-7.  The Superior Court noted that "[t]he use of technology in the courtroom has not yet reached the stage where case law has held that compliance with professional norms would require routine internet background checks of potential jurors," and that defense counsel acted in accordance with professional norms when, upon learning that someone in the district attorney's office recognized Juror No. 5, she requested and obtained Juror No. 5's criminal history, which showed nothing more than a "minor incident of public intoxication."  *Id.* at 6.  Furthermore, the Superior Court found that it was not "reasonably probable that the failure to perform an internet background check affected the outcome," because later in the course of the trial, defense counsel had the opportunity to stipulate to Juror No. 5's removal, but chose not to do so for seemingly tactical reasons.  *Id.* at 6-7.  The Court must determine whether this application of *Strickland* was unreasonable.

///

---

[5]  The Superior Court found a procedural bar to Petitioner's claims of ineffective assistance of counsel, finding that the state habeas petition was untimely.  Ex. 11 at 4-5.  Such a determination is an adequate and independent ground which could warrant denial of Petitioner's federal habeas petition.  *Ylst*, 501 U.S. at 801.  However, the Superior Court nonetheless decided to reach the merits of the claims; thus, this Court will do the same.

United States District Court
Northern District of California

At the outset, the Superior Court was correct that if Petitioner could not establish prejudice, then he could not succeed on his claim for ineffective assistance of counsel, regardless of whether his trial counsel's performance was defective. *Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 n.3 (9th Cir. 1995). No particular finding on the question of performance was required. This Court finds that the Superior Court's conclusion that Petitioner failed to establish prejudice was not unreasonable. First of all, as discussed above, the Court finds a high probability that Juror No. 5 – replete with his history with the criminal justice system – would be a juror that a criminal defendant would want to keep on a jury. However, even if not investigating Juror No. 5 during voir dire was a failure on trial counsel's part, it is highly improbable that the failure to conduct internet research to discover Juror No. 5's background would affect the outcome of the trial, because trial counsel was informed of Juror No. 5's background, and given the opportunity to strike Juror No. 5, prior to jury deliberations. Therefore, any purported failure during voir dire was rendered harmless by that opportunity.

For the reasons stated above, Petitioner has not established that it was unreasonable for the Court of Appeal to conclude that he was not prejudiced by his trial counsel's failure to investigate the background of Juror No. 5. Therefore, Petitioner's fourth claim for habeas relief fails on the merits.

### 2.    *Failure to investigate Volkan's birth defect*

Petitioner's next challenge is to trial counsel's failure to investigate Volkan's Turkish birth records in order to develop evidence that Volkan had a birth defect that caused him to hold his neck at an angle, thus making him more susceptible to death by neck compression. Petitioner alleges that counsel was ineffective because she should have first asked the defense expert, Dr. Hermann, whether evidence of a neck deformity would have made a difference as to his testimony, and then if he answered in the affirmative, she should have ordered Volkan's medical records from Turkey. Am. Pet. at m-25.

United States District Court
Northern District of California

1    The Superior Court identified the two items provided by Petitioner to support his

2    claim of ineffective assistance of counsel: (1) a letter from the defense expert, Dr.

3    Hermann; and (2) a declaration from Petitioner's current counsel, referencing a note he had

4    seen in a file that was written by Petitioner.  The letter indicated that Dr. Hermann had

5    reviewed statements from people who knew Volkan as a child and a photograph of

6    Volkan, and stated how his testimony at trial would have differed had he reviewed the

7    statements and photograph.[6]  Ex. 11 at 7.  The declaration from Petitioner's counsel states

8    that "in some unidentified file there is a written statement by [P]etitioner that [P]etitioner

9    informed his trial counsel of Volkan's neck deformity, but that she 'refused to even

10   investigate it.'"  *Id.* at 8.

11   The Superior Court first found that Petitioner failed to meet the burden of pleading

12   a prima facie case because he did not support his petition "with whatever documentary

13   exhibits are necessary for a complete understanding of his claim."  *Id.* at 7 (citing

14   *Sherwood v. Superior Court*, 24 Cal. 3d 183, 187 (1979)).  The Superior Court noted the

15   convoluted nature of the evidence provided by Petitioner.  First, the Superior Court

16   questioned why Petitioner did not file his own declaration setting forth precisely what

17   steps he asked his counsel to take that she refused, but instead filed a declaration from his

18   current counsel lacking any personal knowledge.  *Id.* at 7-8.  Second, the Superior Court

19   noted that Petitioner only provided the expert's letter, and not the statements or picture

20   upon which his letter relied.  *Id.*  This circular and incomplete evidentiary showing was

21   insufficient to demonstrate that trial counsel's performance fell below an objectively

22   reasonable standard.  *Id.*  Finally, the Superior Court stated that even if Petitioner had met

23   his documentary burden, "he would not have shown prejudice because the medical

24   evidence would not support a defense to the murder charge."  *Id.* at 8.

25   This Court finds that the Superior Court's determination was not unreasonable.  As

26   noted above, to succeed on a claim of ineffective assistance of counsel in federal habeas, a

27

28   [6]    The Superior Court noted that Dr. Hermann "does not indicate that he reviewed any
medical records from Turkey."  Ex. 11 at 7.

United States District Court
Northern District of California

1    defendant must show not just that his trial counsel's performance was objectively

2    unreasonable and that there is a reasonable probability that the result of the proceeding

3    would have been different absent the unreasonable performance, *Strickland*, 466 U.S. at

4    688, 694, but that the state court's application of *Strickland* was itself objectively

5    unreasonable. *Harrington*, 562 U.S. at 101.

6        First, the Superior Court's determination that Petitioner failed to meet the burden of

7    showing ineffective assistance of counsel was not unreasonable. The purported Turkish

8    medical records have not been produced, and the Superior Court was justifiably skeptical

9    as to whether the records exist at all. It appears probable that trial counsel found it to be a

10    waste of time and resources to chase an unsupported lead across continents. The Ninth

11    Circuit has made clear that a difference of opinion as to trial tactics is insufficient to

12    establish ineffective assistance. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981).

13    Based upon an independent review of the record, it cannot be said that trial counsel's

14    decision to not investigate Volkan's alleged birth defect "so undermined the proper

15    functioning of the adversarial process that the trial cannot be relied on as having produced

16    a just result." *Strickland,* 466 U.S. at 686.

17        Second, it was not unreasonable for the Superior Court to find that even if counsel

18    was ineffective, there was no prejudice. Petitioner admitted during trial that he strangled

19    Volkan by squeezing his neck for a period of time. 4 RT 932 (Petitioner stated "Then I

20    squeezed his neck and squeezed his neck and squeezed his neck and – and I heard him

21    saying something like, 'father,' then he collapsed on the floor."). Furthermore, Petitioner

22    admitted that he strangled Volkan because he lost control, due in part to side effects from

23    his heart attack, which made him unable to control his anger. *See* 4 RT 932 (Petitioner

24    stated "I was out of control and I was another person at that time."). Therefore, the

25    Superior Court was correct to state that "without question the illegal act of strangulation

26    was a substantial cause of Volkan's death," and that Volkan's pre-existing condition would

27    not have relieved Petitioner of liability. Ex. 11 at 8 (citing *People v. Caitlin*, 26 Cal. 4th

28    81, 155 (2001)). Therefore, this Court finds that there is not a reasonable probability that

1    the result of Petitioner's trial would have been different, even if trial counsel had somehow

2    been able to produce the medical records and the defense expert's testimony had changed

3    accordingly.  Given the doubly deferential standard of review here, the Court cannot find

4    that the Superior Court's determination was objectively unreasonable.

5           For these reasons, the Court finds that the Superior Court's denial of Petitioner's

6    ineffective assistance of counsel claims was not an unreasonable application of clearly

7    established law, and is fully supported by the record.  Therefore, Petitioner is not entitled

8    to federal habeas relief on these claims, and the claims are DENIED on the merits.

9

10   **II.     Evidentiary Hearing**

11          Petitioner requests an evidentiary hearing on his claims of ineffective assistance of

12   counsel.  Mot. for Evid. Hearing at 6.  An evidentiary hearing on a habeas petition is

13   mandatory only if a petitioner was denied a "full and fair hearing in a state court, either at

14   the time of the trial or in a collateral proceeding." *Townsend v. Sain*, 372 U.S. 293, 312

15   (1963).  The Court need not hold an evidentiary hearing if the petitioner fails to allege

16   facts sufficient to justify habeas relief.

17          In considering whether to grant an evidentiary hearing, the Court must first

18   determine whether a factual basis exists in the state court record.  "It is axiomatic that

19   when issues can be resolved with reference to the state court record, an evidentiary hearing

20   becomes nothing more than a futile exercise." *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th

21   Cir. 1998).  Section 2254 provides that district courts shall afford state court factual

22   findings the presumption of correctness, and that the petitioner must rebut the presumption

23   of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

24          Upon careful consideration, the Court has determined that Petitioner's habeas

25   petition does not allege facts sufficient to entitle him to relief on either claim of ineffective

26   assistance of counsel.  Furthermore, the Court concludes that these claims do not require

27   further evidentiary development beyond the findings of the Superior Court.  The Superior

28   Court's finding that there was no prejudice was correct; therefore, even if Petitioner were

United States District Court
Northern District of California

21

able to elicit new evidence relating to the reasonableness of trial counsel's tactical decisions, such evidence would still fall short of justifying habeas relief.  Because the facts necessary to evaluate Petitioner's ineffective assistance of counsel claims exist in the present record, and because it is extremely unlikely that an evidentiary hearing would yield any further information about trial counsel's decisions, Petitioner's motion for an evidentiary hearing is hereby DENIED.

## III.   Appealability of This Decision

Rule 11(a) of the Rules Governing Section 2254 cases requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the petition is denied.  Rule 11(a), Rules Governing § 2254 Cases.  District courts grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).

Here, Petitioner has not made a substantial showing that his claims amounted to a denial of his constitutional rights, nor has he demonstrated that a reasonable jurist would find this Court's denial of his claims to be debatable.  Accordingly, no certificate of appealability is warranted in this case.  Petitioner is advised that he may not appeal the denial of a certificate of appealability, but he may ask the Court of Appeals to issue a certificate of appealability under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a), Rules Governing § 2254 Cases.

///

///

///

**CONCLUSION**

      For the foregoing reasons, Petitioner's writ of habeas corpus under 28 U.S.C. § 2254 is hereby DENIED.  Petitioner's motion for an evidentiary hearing is also DENIED. Petitioner is not entitled to a certificate of appealability under 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

Dated:  05/04/16

THELTON E. HENDERSON
United States District Judge